**THE MARTHA R. GRIMES.**

**In re LENAHAN.**

**In re LEHIGH VALLEY R. CO.**

District Court, S. D. New York.

Feb. 3, 1943.

592

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for petitioners R. Lenahan Co. and Dwyer Lighterage, Inc.

Pyne & Lynch, of New York City (Warner Pyne, of New York City, of counsel), for petitioner Lehigh Valley R. Co.

Arthur L. Obre, of New York City (Robert R. Bauman, of New York City, of counsel), for claimant.

GODDARD, District Judge.

Petitions of R. Lenahan Company, as owner, the Dwyer Lighterage, Inc., as charterer, and Lehigh Valley Railroad Company, as sub-charterer of the barge Martha R. Grimes, for limitation of or exoneration from liability pursuant to the provisions of Sections 4283–4286, Revised Statutes, 46 U.S.C.A. §§ 183–186, for damages as a result of injuries sustained by Henry Marin, claimant. Upon trial the proceedings were consolidated for all purposes.

The barge Martha R. Grimes owned by R. Lanahan Company was chartered to the Dwyer Lighterage, Inc. The Dwyer Lighterage, Inc., employed a barge captain for the barge who continued in its employ and pay, and sub-chartered the barge, accompanied by the barge captain, to the Lehigh Valley Railroad Company at the rate of

$15 per day. After being loaded with a cargo of grain at its Jersey City Terminal, a tug of the Lehigh Valley Railroad Company towed the Grimes to the foot of Columbia Street, Brooklyn, and left her at the dock where the grain, which was in bags, was to be discharged into a steamship. William Spencer & Son Corporation who had a general contract with the Lehigh Valley Railroad Company for loading and discharging vessels, sub-contracted with Sabbatino & Company, another stevedoring concern, to discharge the Grimes.

On December 4, 1941, about 1 o'clock, Henry Marin, the claimant, one of the gang of men employed by Sabbatino & Company, when returning from lunch and descending a ladder leading from the deck of the barge to the bottom of the hold where he had been working, fell and sustained injuries as a result of the ladder being insecurely placed and fastened. The ladder belonged on the Grimes and when the hatch covers were removed that morning the ladder, which had been on the hatch, was placed on the deck. It was a wooden ladder, 14 or 15 feet long; the uprights were 2 x 4 inches with slats some 3 inches wide nailed to the two inch surface of the uprights. The top of the ladder rested against the hatch coaming and the lower ends of the uprights on the floor of the hold. The ends of the uprights were square so that as the ladder, which was "not quite straight up and down" but slanted away from the coaming, rested on the heels of the uprights.

The testimony as to who placed the ladder in position in the hatchway and its precise location is conflicting. Witnesses for claimant testify that it was put there by Cunningham, the barge captain. He says that the stevedores placed it there; that he saw the ladder in the hatchway and that he lashed it; that some two weeks before when he came aboard the Grimes he tied a one-half inch rope to the right upright as one would face the ladder to descend just below the first rung; that when he saw the ladder in the hatchway he made the loose end of the rope fast to a permanent wire cable which passed around the hatchway. My conclusion, after hearing the witnesses and considering the probabilities, is that Cunningham put the ladder in position and that it was near one of the cross-beams of the deck. The testimony of Thiel, one of the stevedores working in the hold, whose

testimony I thought was reliable, said that when it got near 12 o'clock the stevedores yelled for the ladder and that the barge captain slid the ladder down into the hold; that some of them came up the ladder and others climbed up on the bags of grain. Marin, thirty six years old and weighing about 195 pounds, testified that when he came back from lunch he saw the ladder; that before stepping on it "I tried the ladder and it seemed to me it was all right * * *. I could not see the lower end or how it was resting * * *". That he started down facing the ladder and held on to the coaming and the uprights; that when he was stepping from about the third to the fourth rung with his right foot the ladder slid to the right and turned from left to right and he fell to the bottom of the hold landing on his head. Thiel, who was down in the hold at the time, said he saw Marin on the ladder about the third rung when suddenly the ladder twisted to the right and the bottom part slid to the right and Marin fell.

There is no reliable evidence that one of the uprights was shorter than the other as alleged, but the ladder had been placed and fastened in such an insecure manner that it turned while Marin was on it. There is no evidence that Marin was negligent; he exercised reasonable caution under the circumstances and he had the right to assume that due diligence would be used to guard him against danger in the employment in which he was engaged. The Red Jacket, D.C., 110 F. 224; Choctaw, Oklahoma & Gulf R. Co. v. McDade, 191 U. S. 64, 24 S.Ct. 24, 48 L.Ed. 96, Marin was only charged with risks of which he was aware or were so plainly observable that he must be presumed to have known of them. Texas & Pacific R. Co. v. Archibald, 170 U.S. 665, 18 S.Ct. 777, 42 L.Ed. 1188; Chesapeake & Ohio R. Co. v. Proffitt, 241 U.S. 462, 36 S.Ct. 620, 60 L.Ed. 1102; Port of New York Stevedoring Corporation v. Castagna, 2 Cir., 280 F. 618.

The ladder and the rope furnished by the owner of the barge were suitable for the purpose. Marin's fall was due to the fact that the barge captain had placed the ladder in an insecure position and lashed it in an insecure manner. This negligence of the barge captain was the cause of Marin's injuries. The ladder was placed in the hatchway by the barge captain

as an invitation to the stevedores to use it as a means of access to their work and with the expectation that they would do so.

■ Where a vessel is in charge of stevedores or independent contractors, the vessel is not liable in admiralty to such stevedores or their employees for injuries unless a contractual relationship exists between the vessel and the injured person, or the injury was sustained as a result of the failure of the owner or charterer of the vessel, as in the case at bar, to provide a reasonably safe place for the men to work and passage to the work. Cf. The Saranac, D.C., 132 F. 936; Cf. The Citta di Palermo, 5 Cir., 230 F. 602; Grays Harbor Stevedore Co. v. Fountain et al., 9 Cir., 5 F.2d 385. But the owner of a vessel who engages stevedores to load or discharge his vessel is liable for the failure to provide a reasonably safe place for the stevedores to work and a reasonably safe passage thereto. Cf. The Thyra, D.C., 114 F.978; Pioneer S. S. Co. v. McCann, 6 Cir., 170 F. 873; The Saranac, D.C., 132 F. 936; The Indrani, 4 Cir., 101 F. 596; Gerrity v. Bark Kate Cann, D.C., 2 F. 241, 246; The No. 34, 2 Cir., 25 F.2d 602; The Lillian, D. C., 16 F.2d 146; The Queen Elizabeth, D. C., 209 F. 712.

■ In the case at bar it was not the vessel owner, but a charterer, the Lehigh Valley Railroad Company which engaged the stevedores. As between the Lehigh Valley Railroad Company and the claimant, it owed to him and those who did the actual work the corresponding duty of furnishing them with a reasonably safe place to work and access to it, and the Railroad Company is liable to him for its failure. But as was said in Dailey v. Carroll, 2 Cir., 248 F. 466, at page 468: "Third persons may, of course, regard charterers such as these libelants as owners, and the crew as the charterer's crew; but, as between the parties to the contract of charter, the question may always be asked: For whom was a given employe acting when the act complained of occurred?" See also Smith v. Booth et al., D.C., 110 F. 680, affirmed 2 Cir., 122 F. 626.

■ The owner of the Grimes had chartered the bare boat to Dwyer Lighterage, Inc. Dwyer Lighterage, Inc., employed a barge captain whose wages it continued to pay and chartered the barge, accompanied by the barge captain, to the Lehigh Valley Railroad Company. Under these circumstances the barge captain remains the agent and servant of the Dwyer Lighterage, Inc. As between the Dwyer Lighterage, Inc., and the Lehigh Valley Railroad Company the Dwyer Lighterage, Inc., continues to be responsible for injuries resulting from the barge captain's acts and negligence. While no cases have been cited by the proctors for the litigants, and I have found none precisely in point, this conclusion logically follows from the many decisions holding that where the owner employs and pays the barge captain who accompanies a chartered barge, the barge captain remains the agent and servant of the owner. See The Cary Brick Co. No. 8, D.C., 34 F.2d 981; Dailey v. Carroll et al., 2 Cir., 248 F. 466; Zabriskie v. City of New York, D. C., 160 F. 235; Harbor Towboat Co., Inc., et al. v. Lowe, etc., D.C., 47 F.Supp. 454; 58 C.J. Section 235.

■ Under Section 4286, Revised Statutes, 46 U.S.C.A. § 186, a charterer shall be deemed the owner of a vessel within the meaning of the provisions relating to limitation of liability of the owners of vessels in case the charterer "shall man, victual, and navigate such vessel at his own expense, or by his own procurement"; and this applies to barges. Section 4289, Revised Statutes, 46 U.S.C.A. § 188. The Dwyer Lighterage, Inc., did man, victual and navigate the Grimes at its own expense. For in so far as a barge without its own motive power may be navigated, it is the barge captain that navigates or operates the barge and he was procured by Dwyer Lighterage, Inc. Therefore, it is entitled to limitation of liability as there was no knowledge or privity on its part as to the act of the barge captain. R.S. § 4283, 46 U.S.C.A. § 183. The Lehigh Valley Railroad Company did not "man, victual and navigate" the barge; this was done by Dwyer Lighterage, Inc., and the Lehigh Valley Railroad Company is not entitled to limit its liability. The James Horan, D.C., 10 F.Supp. 28, affirmed 78 F.2d 870, certiorari denied sub nom. Warner-Quinlan v. Swan-Finch, 296 U.S. 621, 56 S.Ct. 142, 80 L.Ed. 441; Smith v. Booth et al., D.C., 110 F. 680, affirmed, 2 Cir., 122 F. 626.

■ The claimant, Marin, sustained a fracture of the base of the skull in the right mastoid region about two inches long; fractures of the fourth and fifth cervical

vertebrae with their displacement. After the accident Marin was removed to a hospital and his neck and shoulder were placed in a plaster cast, which was later replaced by a steel and leather brace to support his head and chin, which he testified he wore continually up to the time of trial. He also suffered shock and pain. He has had a good recovery and the fractures in the skull and vertebrae are healed, but he has a fifty per cent limitation in the forward motion of his neck, which will probably improve, and a slight loss of hearing in his right ear. After hearing the medical testimony, I am convinced that he can now discard the head brace, and perhaps could have done so before this, and that he can go to work now or in the near future. He appears strong and capable of doing manual work. His hospital bill was $110.55; the brace cost him $35.35 and his doctor testified that a fair and reasonable value for his professional services is $1,080. Marin was earning $48 per week at the time he was injured and had not worked since, so he has lost $2,496 in earnings. In my opinion $7,000 is a fair award to him for the injuries and damages which he has sustained.

My conclusion is that Dwyer Lighterage, Inc., is liable in the amount of its bond of $4,500 filed in the limitation proceeding, and the claimant should have a decree against that company for that amount, and against the Lehigh Valley Railroad Company for the deficiency between the amount of the Dwyer Lighterage, Inc., bond and the $7,000 awarded to the claimant, with costs.